MARÍA MÉNDEZ, ETC., ET AL., Plaintiffs and Appellees, v. ANTONIO SERRACANTE SANTIAGO, Defendant and Appellant.

No. 7547. Argued June 22, 1938.—Decided November 14, 1938.

808

*R. Rivera Zayas* for appellant. *R. Díaz Collazo* for appellees.

Mr. Justice De Jesús delivered the opinion of the court.

This is an action for damages caused by the death of Antonio Rocafort. The amended complaint is very brief. The essential paragraphs, in so far as pertinent, read as follows:

"4. That on September 21, 1934, in the city of San Juan. . . the defendant Antonio Serracante caused the death of Antonio Rocafort, from whom plaintiffs claim, by inflicting upon him bullet wounds in the abdomen. . . as a result of which he died on September 23, 1934, leaving as his nearest relatives and as his sole heirs the widow María Méndez, plaintiff herein, and his legitimate children Antonio and Iris Rocafort Méndez, unemancipated minors under the *patria potestas* of their mother, the aforesaid María Méndez.

"* * * * * * *

"6. That the defendant. . . in causing the death of plaintiffs' predecessor in interest in the manner hereinbefore set forth, deprived plaintiffs of the person who was supporting them. . . and that *the said defendant, by the unlawful acts and conduct hereinbefore set forth, has thus* caused damages and injury to plaintiffs in an amount which reasonably calculated and estimated is not less than $25,000." (Italics ours.)

The defendant demurred on the ground of want of facts sufficient to constitute a cause of action. He answered in the

same document, setting up three special defenses, which in brief are that the death of Rocafort was caused by his own fault and negligence in joining with two other persons to assault the defendant, and that his death was due to an unfortunate accident in that the aforesaid Rocafort himself pressed the trigger of a revolver which he was holding in his hands and which the defendant was trying to take away from him to avoid an attack with the weapon. That even if it had been the defendant who fired the shot, there is no liability for the death because in such case the defendant was exercising his right or legitimate self-defense.

From a judgment adjudging him to pay to the plaintiffs $5,000 damages and costs, defendant has taken this appeal, in support of which he attributes to the lower court the commission of three errors, to wit:

1. In overruling the demurrer for failure to state facts sufficient to constitute a cause of action.

2. In entering judgment for plaintiffs, in spite of the entire absence of evidence to show that the plaintiffs are the sole heirs of Antonio Rocafort; and

3. In weighing the evidence.

We shall consider the three assignments in the order set forth.

It does not appear from the record or from the transcript of the evidence that defendant's demurrer was brought to the attention of the court. Nor does it appear that there has been any decision thereon. Nevertheless, the ground for demurrer is of such a nature that if sustained, the order would have been incompatible with a judgment favorable to plaintiffs without an amendment to the complaint. We must therefore presume that the demurrer was implicitly overruled by the court.

Having made this clarification, let us turn to the merits of the demurrer.

This court has repeatedly and constantly held that in this jurisdiction an action for damages for wrongful death

is founded on section 1802 of the Civil Code (1930 ed.), which is section 1803 of the 1911 Compilation. *Orta* v. *Porto Rico Railway, Lt. & P. Co.*, 36 P.R.R. 668; *Carbou* v. *Mir*, 36 P.R.R. 728; *Cabrera* v. *Boscio*, 38 P.R.R. 282; *Pérez* v. *Succrs. of M. Pérez & Co.*, 41 P.R.R. 844; *López* v. *American Railroad Co.*, 50 P.R.R. 1, 7; and lastly *Ruberté* v. *American R. R.*, 52 P.R.R. 457, 458.

 The above-cited section 1802 textually reads as follows:

"Section 1802.—A person who by an act or omission causes damage to another *when there is fault or negligence* shall be obliged to repair the damage so done." (Italics ours.)

It is insufficient, in accordance with this provision of law, to allege that the death was caused by the defendant or by another for whose acts the defendant is responsible. It is indispensable to aver that the proximate cause of death was the fault or negligence of the person causing it. The mere fact of causing death by a firearm or by any other means does not imply fault or negligence upon the part of the defendant, since it might have been caused by defendant's exercise of his right of legitimate self-defense, as is alleged in this case, or by a lawful act done with necessary prudence and circumspection.

In commenting upon section 1902 of the Spanish Civil Code, identical with section 1802 of our Code (1930 ed.), Manresa cites with approval the judgment of the Supreme Court of Spain of June 23, 1900, where it was held:

". . . that 'the action for damages caused by acts or omissions where there is fault or neligence, necessarily requires the showing of one or the other of such elements, since they constitute the essential basis of the action, according to sections 1089, 1093, 1902, and 1903 of the Civil Code, and *the burden of proof* therefore *rests upon the plaintiff*, in accordance with the general principle as to the proof of obligations laid down in section 1214. *For such a showing the inadmissible contention that liability must be presumed from the mere existence of injury and that the burden rests upon the defendant to*

*show his non-liability, is insufficient.'* Consequently, for the successful maintenance of a suit for damage under the section which we are considering, it is indispensable not only to show injury, but also to show the fault or negligence causing the same." (12 Manresa, *Código Civil Español*, p. 614.) (Italics ours.)

On page 615 of the same volume, Manresa repeats:

"The same court, by a judgment of December 4, 1903, again stated that 'for the successful prosecution of a civil action for damages caused, not by failure to perform an obligation, but by an act or omission constituting a crime or *quasi*-crime, it is insufficient to show the existence of injury, since there must be in addition evidence showing that the injury arose from the fraud, fault, or negligence of the person so charged. There is no such liability when the actor, instead of acting with malice or fault, has limited himself to the exercise of his lawful rights.' "

On page 616, in referring to the judgment of December 23, 1905, Manresa states:

". . . in order for section 1902 and the succeeding section, 1903, of the Civil Code to be applicable, it is an indispensable requirement that there shall have have been fraud, fault, or negligence to such an extent that where the trial court did not deem these factors proved, but on the contrary held that the lawfullness of the acts that nevertheless gave rise to the accident had been established, reliance on the sections in question on appeal (*casación*) is ineffectual. This judgment was followed in that of May 30, 1906, where it was held that, for the successful prosecution of an action founded on section 1902, it is not sufficient that there should have been an act *implying* fault or negligence, but that there must be a showing that as a *result thereof* a third person has *suffered* injury or damage."

Finally on page 617, Manresa summarizes his comments as follows:

"From the statements in the judgments which we have cited we may conclude that to give rise to the obligation imposed by the section under consideration, it is necessary that there be a concurrence of two distinct requirements, to wit: (1) that there be injury or damage not arising from the acts or omissions of the injured person himself, the existence of which is duly shown by the claimant; and (2) that such injury or damage have been caused by the fault or negligence of a person other than the injured person."

Plaintiffs will argue that the italicized phrase in paragraph 6 of the amended complaint, which reads: "and that the said defendant, by his unlawful acts and conduct hereinbefore set forth . . .," constitutes the averment of fault or negligence to which we have been referring, but since from the face of the amended complaint no such exposition appears, there is no escape from the conclusion that the averment is a mere conclusion of law, divorced from its supporting facts, and as such may not be taken into account in considering defendant's demurrer. *Peñagaricano* v. *Peñagaricano et al.*, 19 P.R.R. 472.

The case of *Heirs of Peraza* v. *Marín*, 40 P.R.R. 341, offers no authority to support the sufficiency of the complaint in this case, since, although it was there alleged in the complaint that "Marín caused the death of Peraza deliberately and maliciously" and although the words "deliberately and maliciously" amount to a mere conclusion of law, it is no less true that the defendant did not make objection to that defect in the complaint and on the contrary, by stipulation of the parties, the transcript of evidence in the criminal case was offered in evidence for the facts that led up to the death. This court said in the above cited case of *Heirs of Peraza* v. *Marín* that what was there involved was a clear case "of a crime perpetrated with extraordinary cruelty."

Since no objection was made in that case to the sufficiency of the complaint and since the evidence presented by plaintiff with defendant's acquiescence showed that the case was one of murder, or in other words, a crime without any legal justification, the defect in pleading was cured by the evidence, which clearly established that the death had been caused by defendant's fault.

The amended complaint in this case lacks an averment essential and indispensable for the existence of a good cause of action. This being true, the trial court in not having

sustained the demurrer, committed the first error assigned by appellant.

Let us turn now to the second assignment. We have made a careful examination of the transcript of evidence, and it does not appear therefrom that the plaintiffs *are the sole heirs of* Antonio Rocafort. Nor does it appear therefrom whether Rocafort died intestate or testate, nor is there any evidence to show that Rocafort left no legitimate or acknowledged natural descendants other than the two children here plaintiffs.

Section 61 of the Code of Civil Procedure, which, although not as we said above the original source of the right of action, appears under the title "Of the Parties to Civil Actions," and which governs actions such as this in which the plaintiffs litigate in their capacity as heirs, has been interpreted not only by this court but also by the courts on the continent to mean that when the heirs sue, one must do so on behalf of all or all must join as plaintiffs, and if one should refuse to join the others, he must be made a defendant and the reason thereof must be stated in the complaint in accordance with the provisions of section 66 of the same code. The point is that the action contemplated by the statute is a single action, and also that the judgment which may be entered in favor of the heirs for the full value of the lost life, must be a single judgment. To this effect see the annotation in L.R.A. 1916E, page 170, under the title "Joinder of Beneficiaries." In the case of *International & G. N. R. Co.* v. *Howell,* 105 S.W. 560, decided by the Supreme Court of Texas in 1907, the action for wrongful death was not brought by all the heirs. The court held that the defendant was entitled to a stay of the proceedings until all the heirs should be made parties to the suit. In the case of *Hougland* v. *Avery Coal & Min. Co.,* 93 N.E. 40, decided by the Supreme Court of Illinois in 1910, it was held that where minor children are the sole survivors, the action must be by or in behalf of all of them, for there can be but one recovery

814

for the entire loss. The Court of Appeals of New York expressed itself to the same effect in the case of *Johnson* v. *Phoenix Bridge Co.*, 90 N. E. 953. The question was decided by this court in identically the same way in the case of *Carbou* v. *Mir, supra.* In that case, Carbou Rodríguez, as the sole heir of her natural mother Inocencia Rodríguez, brought an action for damages for the latter's death. On appeal from a judgment of the District Court of San Juan in favor of plaintiff, it was urged among other assignments that it had not been established that the plaintiff was the sole heir of her mother Inocencia Rodríguez. In considering this assignment, the court said (at page 735):

"There remains only to be considered the last alleged error. The appellant contends that the plaintiff not having shown that he was the sole heir and still less that he was the heir of Inocencia Rodríguez, the complaint should not have been sustained.

"We have considered the evidence and it shows, in our judgment, that the plaintiff was the heir of Inocencia Rodríguez, though really it does not show that he was the sole heir, albeit everything leads to the belief that he was.

"Section 61 of the Code of Civil Procedure and the jurisprudence provide that the action should be brought jointly by all the heirs or by only one in behalf of all.

"Therefore we find ourselves bound to reverse the judgment appealed from for the sole purpose of determining whether or not the plaintiff is the only heir, and the trial court must render a new judgment in accordance with the result of the evidence submitted to that end, all in conformity with the principles established in this opinion."

Appellant's second assignment of error is also well taken.

Following the course laid down in the case last cited, we could reverse the judgment appealed from and remand the case to the lower court so that in furtherance of justice the plaintiffs might be permitted again to amend their complaint, to aver that the death was caused by defendant's fault, and to present evidence to the effect that they are the *sole heirs* of Antonio Rocafort. But courts should not make futile orders, and it would be manifest futile to remand this

case to the lower court for further proceedings, if whatever might be the result of those proceedings, we would be compelled to dismiss the complaint upon the ground that it appears from the evidence that Rocafort's death was not wrongful. Let us therefore turn to a consideration of the case on its merits, passing thus to the third and last assignment of error, that is, that the court committed manifest error in weighing the evidence.

From the evidence it appears that Manuel Valencia and Marieta Jordán were joined in matrimony and that prior to September 21, 1934, the bonds of matrimony were dissolved by a judgment of divorce. That after the dissolution of the marriage, the defendant Serracante began to court Marieta Jordán, which caused a coolness between Serracante and the Valencia family, with whom he had theretofore been friendly. That according to Manuel Valencia and some of his witnesses, Marieta Jordán on September 20, 1934, complained to Manuel that Serracante was pursuing and annoying her and for that purpose begged his protection, sleeping in Valencia's house on the night of September 20, which exasperated Serracante, who with the assistance of one of Marieta's relatives was able on the morning on the 21st to get her out of the Valencia family house and to take her to the house of this same relative on Luna Street, in front of the Cathedral. That on the night of the 21st, between 7 and 8, Serracante was driving alone in an automobile to visit his sweetheart and in passing in front of the Capitol was seen by Manuel Valencia, who together with his brother Luis and his intimate friend Rocafort, was according to him and to his brother Luis going to the Restaurant El Chévere, at Stop 22 in Santurce. That on seeing Serracante, Manuel ordered Luis to turn around and follow him, because he felt the need of talking to him. He did so, and at the moment when Serracante stopped his automobile in front of the Cathedral, on Luna Street, the car in which Rocafort

and the Valencia brothers were riding also stopped alongside of Serracante's car.

Up to this point there is no conflict in the testimony. The disparity arises from the description which the two parties, plaintiffs and defendant, give of the events which took place on Luna Street and which ended with the death of Antonio Rocafort.

The brothers, Manuel and Luis Valencia, the only witnesses for plaintiffs who testified as to what happened on Luna Street, state: That when Serracante stopped his automobile and began to get out, Manuel Valencia came close to him, Luis and Rocafort remaining in the car. That at the beginning of the conversation between Manuel and Serracante, the latter, according to Manuel, "made a gesture of putting his hand behind him." According to Luis, he took out a revolver, and at that very moment Manuel struck Serracante with his fist. Serracante then fired his revolver without hitting anything, Manuel taking cover behind the car. Then Luis, followed by Rocafort, came up and seized Serracante to prevent him from using the weapon. Rocafort was holding him by the arm in the hand of which Serracante was holding the revolver, and Luis was holding him by the other. Meanwhile Manuel was hitting him with his fists, running a little later to his car to get an iron rod with which he hit Serracante several times on the head, causing him to bleed profusely. Serracante, defenseless, was trying to release himself from those who were holding him, and at last was able to fire another shot straight ahead, which caused the Valencia brothers to retire, remaining a short distance from Serracante who continued to struggle with Rocafort, who, according to the Valencia brothers, was fighting for the sole purpose of disarming Serracante and with no intention of harming him. There were two more shots in this fight and when the pair turned toward the Valencia brothers, they were informed by Rocafort that although he was still fighting, he had been badly wounded. Just then

the police arrived, disarmed Serracante, and arrested him. Rocafort was taken to the hospital where he died three days later as a result of the bullet wound which he had received.

Antonio Serracante testified that when he stopped his car in front of house number 30 on Luna Street, and while he was getting out backwards because he was riding in the front seat, Manuel, Luis, and Rocafort "jumped on top of him," and while Rocafort and Luis held him, Manuel was hitting him with a piece of iron covered with leather, something like a whip, giving him four or five blows in the head "which left him dazed." That Manuel was assaulting him with the iron rod and Luis Valencia with blows with his fists in the face, and when he tried to defend himself from Manuel, whose blows were doing him more damage, Luis and Rocafort subdued him. That at last he was able to release himself from Luis Valencia, but then Rocafort caught him by both his arms and at that moment Serracante was able to snatch the revolver from one of his assailants, he could not say which. The Valencia brothers then fled and he, Serracante, stayed there fighting with Rocafort. That then, in the struggle for the possession of the revolver which Rocafort was trying to take away from him, there were three shots, another having previously been fired while the revolver was in the hands of his assailants. The Valencia brothers then attacked him anew and Rocafort continued to hold him, and in that struggle, he does not know how, Rocafort was wounded.

Antonio Villafañe, a witness for the defendant, who at the time of the fight was walking along Lune Street, testified: That he was walking along Luna Street between 7 and 8 at night and that he noticed an automobile go by followed by another, a two-seater. That from the latter car three persons got out, one of them a fat man who he later found out was called Rocafort, who spoke to the person who was in the first car and pulled him outside, seizing him by the arms and getting a wrestling hold on him. Meanwhile

another man was hitting him with an iron rod, and at the same time the smallest of the three was hitting him in the face with his fists. The witness then caught hold of the man with the rod and began to struggle with him. There were three against one. Then the shots were heard and the witness believes that Rocafort was wounded, whom he heard say: "Don't shoot any more, I've been wounded." They then took hold of Rocafort and carried the wounded man off.

José Odilio Vega, also a witness for the defendant, after stating in answer to questions of defendant's attorney that he had no connections of any kind with Serracante, testified: That on the night in question he was visiting on the balcony of a house in which his sweetheart, now his wife, lived, on the second floor of the house at No. 32 Luna Street, and saw an automobile pass in which Serracante was riding. The latter stopped, and immediately behind, very rapidly, a car following him turned the corner "almost on two wheels," and from the latter car three persons got out and went toward Serracante, seized him, and practically pulled him out of the car, although they did not drag him. One of them pushed him, he fell in the arms of another, and the fight then began. One of them was using a weapon, which must have been a bruising weapon, because he struck Serracante several times in the head with it while Rocafort was holding him from behind and while the other brother was also attacking him. That at that moment, when Serracante was bathed in blood, a girl in his sweetheart's house got nervous and the witness went in to soothe her, and that he then heard several shots. When he came out again on the balcony, they were in a cluster, the Valencia brothers attacking Serracante from the front, and Rocafort fighting with him to take his weapon away, until the police arrived.

We have purposely left for the last the testimony of Mrs. Carmen Tirado de Herrero, because, as the lower court stated, it merits entire credit and it was upon this testimony

that said court based its conclusions leading to the entry of the judgment appealed from.

Mrs. Tirado de Herrero testified that she lives at 34 Luna Street and that on the night in question she was at home. That between 7 and 8 she noticed two cars arrive almost simultaneously. That three men got out of the car which arrived last and, before the man who was driving the first car could get out, they attacked him with some bruising weapon and that she was able to hear the blow. Then still fighting they moved out into the middle of the street and kept on fighting, and one of them was holding the other from behind.

"They kept on striking him. Then there were some shots. At the first shots, two of them ran away and one stayed, who they afterwards said was Rocafort, still holding on to him, fighting, and then there were some more shots; then the people crowded around, were able to separate them, taking two of the fighters to the Cathedral wall. Then the police came."

Later, upon cross-examination by counsel for plaintiffs, she testified that she did not see who took out the revolver, but on refreshing her memory with a statement made before the district attorney, some hours after the events, she admitted that she saw Serracante draw the revolver. Her testimony as it has been set forth coincides exactly with her statement before the district attorney, except as to the person who drew the revolver, which she seemed unable to recall at the trial.

The remainder of the evidence refers to the relations between Manuel Valencia and Antonio Serracante with respect to Marieta Jordán, and is here pertinent only to show the motive which gave rise to the unfortunate encounter between Manuel Valencia and Antonio Serracante.

In the opinion upon which the judgment appealed from is based, the judge of the lower court makes a resumé of the testimony of Manuel and Luis Valencia, and of that of Antonio Serracante, which is in accordance with the sum-

maries which we make in this opinion, but which ignores absolutely, but without saying why, the testimony of Antonio Villafañe and Odilio Vega, and bases his judgment exclusively on the testimony of Mrs. Tirado de Herrero, summarized above. The opinion is as follows:

"But they (the Valencia brothers and Serracante) are interested parties. From a consideration of all the evidence for both sides, the court believes that Mrs. Carmen Tirado Géigel de Herrero gave the truest account of what happened. She witnessed the scene from the balcony of her house, and her testimony seems to us to be worthy of our entire credit, since she has no interest in the matter. (The court here sets forth the testimony of Mrs. Tirado and then continues with the opinion as follows:)

"We thus find that, these being the facts, when Antonio Serracante fired the first two shots, Manuel and Luis Valencia ran off and left Antonio Serracante and Antonio Rocafort struggling together, the latter in order to take the revolver from the former. There were then two more shots, one of which wounded Antonio Rocafort in the abdomen and two days later caused his death. The weapon was taken by the police from the possession of Antonio Serracante. Antonio Rocafort was not armed, nor did he assault or strike Antonio Serracante; he merely held him by the arms and struggled with him to take away from him the revolver which he had. Antonio Serracante, nevertheless, fired the last two shots, or the fatal shot, when his assailants had already run away, thus using more force than was necessary to repel the attack upon him by Manuel and Luis Valencia. The killing of Antonio Rocafort was without excuse. It has not been shown that he joined with Manuel and Luis Valencia with the deliberate intent of assailing Antonio Serracante, who armed himself beforehand with a revolver. His intervention was not that of an assailant or a fighter." (Transcript of Record, p. 30, 31.)

Accepting as we do the whole of the testimony of Mrs. Tirado de Herrero, which in substance corroborates that of Serracante, Villafañe, and Vega, it necessarily follows that the lower court erred, not only in weighing the evidence, but also in applying the law to the proved facts, which we may summarize as follows:

Serracante, who was driving alone in his car, stops in front of his sweetheart's house. The automobile in which

the Valencia brothers and Rocafort are riding and which was following him, stops alongside the first. The Valencia brothers and Rocafort get hurriedly out of their car and while Serracante was getting out of his car, the three throw themselves upon him, Rocafort holding him and the Valencia brothers assailing him, one with his fists and the other with an "apparatus" (as Mrs. Tirado de Herrero calls it). While this is going on, Serracante receives, without being in the slightest degree able to avoid it, blows from the Valencia brothers. Rocafort, a strong and corpulent man, continues to do him the favor of holding him helpless. In the middle of this struggle, Serracante manages to draw a revolver and to fire one or two shots, obliging the Valencia brothers to draw to one side, but not to withdraw completely from the scene of events and still ready at any propitious moment to renew their attacks. Rocafort continues to struggle to disarm Serracante, and in that fight we concede that it was Serracante who pulled the trigger and fired the shots, one of which caused Rocafort's death.

Now, then, the evidence for both sides shows that Serracante did not know Rocafort, even by sight. But it does show that Rocafort was not accidentally there, but that he came along with the Valencia brothers in the same automobile in which the latter were pursuing Serracante, and far from trying to dissuade them from their purpose or himself to withdraw, reaches the scene with them. Furthermore, his first act, according to the testimony of Mrs. Tirado, Serracante, Villafañe, and Vega, is not to come between the parties to prevent the fight, but to grasp Serracante by the arms and to keep him entirely helpless, at the mercy of his assailants, to such an extent that if he had not had the good fortune to fire the first two shots which freed him momentarily from the Valencia brothers, he would have been overcome by the blows which Manuel Valencia was inflicting on his head with the iron rod.

Was not Serracante justified, under the circumstances, while he was momentarily fighting alone with Rocafort, in believing that once he was disarmed, either Rocafort himself or the Valencia brothers would renew their attacks in the certainty that they were facing a wounded and disarmed man? We cannot require, as the lower court requires, that the defendant directly prove that Rocafort had joined the Valencia brothers "with the deliberate intent of assailing" Serracante. The intent which at that moment Rocafort might have had in his mind only God and he knew, but the facts, undoubtedly more eloquent than words, would have induced any man of reasonable courage, under the pressing circumstances in which Serracante found himself, to believe that Rocafort, whom he had never even known before, was an aggressor and that in fighting with him to keep the revolver he was fighting with an enemy and not with a mere peacemaker. The law does not demand that the danger of loss of life or of great bodily harm justifying a homicide on the ground of self-defense be a real danger. Assuming without admitting that in this case there was no real danger, it was only too apparent. We cannot therefore agree with the judge of the lower court when he says:

"Antonio Serracante, nevertheless, fired the last two shots, or the fatal shot, when his assailants had already run away, thus using more force than was necessary to repel the attack upon him by Manuel and Luis Valencia."

We may well repeat here the wise words of Mr. Justice Córdova Dávila in the case of *Garcia* v. *American Railroad Co. of P. R.*, 45 P.R.R. 738:

"We must not expect from human nature more than what it can humanly give."

The foregoing reasoning leads us to the conclusion that Serracante, in depriving Rocafort of his life, did so in the exercise of his right of self-defense, and this being true, the ends of justice would in no way be served by remanding the

case to the lower court for further proceedings. It is therefore proper for us to render the judgment which should originally have been rendered by the district court, that is, to dismiss the complaint with costs against the plaintiffs, but without attorney's fees, since we believe there has been no rashness upon the part of plaintiffs, as they in all probability were induced to believe that they had a good cause of action by the statements undoubtedly made to them by the witnesses Luis and Manuel Valencia, who were with the decedent at the moment when he received the wound which later caused his death.

Mr. Chief Justice Del Toro took no part in the decision of this case.